Next case, if I pronounce the first word properly, Koninklijke Philips, we'll call you Philips v. Zoll Medical Corporation, 2014-17-64, Mr. Jakes. Good afternoon, and may it please the Court. We call him Philips. It's easier for us. Mr. Jakes, I confess to be somewhat confused about the relationship between the briefs and the jury verdict. I assume the jury verdict form was agreed to by both parties? It was agreed to by both parties. The form of it was largely suggested by Zoll. We had something that was a little bit different, for example, on the direct infringement question, but then it was jointly submitted to the Court. Okay, but you argue both in your briefs about whether the jury verdict of direct infringement by Zoll can be sustained. I look at the jury verdict. I don't see any jury verdict finding that Zoll directly infringed. What am I missing? Well, Your Honor, the verdict does say that the device is directly infringed. Yeah, but it doesn't say that Zoll directly infringes. Well, that is true. Then why are we arguing about it? Why is that being treated as an issue in the case if there's no jury verdict that Zoll directly infringed? We have not appealed that. That's the other side's cross-appeal. We agree that the device is infringed, and they infringe the method claims, and Zoll is responsible for that. You're not claiming that you have a jury, that there is a jury verdict about Zoll's infringement, right? Well, Your Honor, it does say that Zoll's device is directly infringed. But that's not the same thing as Zoll. The devices could be infringing by anyone's use, but there's no jury finding that Zoll directly infringed. Well, I believe that the parties treated that as Zoll, and the judge entered a judgment on that of direct infringement, and now Zoll has challenged that. I don't follow that. I really don't. I don't understand how you can get out of that jury verdict, direct infringement by Zoll, but I don't want to hold up your time. I just don't see it. We're okay with the jury verdict, because the devices do practice the method, and they do infringe. So your primary contention is that the jury should have found contributory infringement, right? That's right, Your Honor. They should have found contributory infringement here. And if I could, I'll just go straight to the knowledge requirement, because I think that is the one that probably is the most concern. It seems to me, in that respect, there's quite a bit of difference between the test claims and the waveform claims. With respect to the test claims, they have never argued about infringement. They've conceded infringement. That is true. With respect to the waveform claims, they argue that they had a substantial argument against infringement. And so address that second set of claims as to why that doesn't, under the Supreme Court's decision in Comell, mean that the jury could find that there was no contributory infringement. With respect, now we're just talking about the waveform claims. Focusing particularly on the knowledge requirement, I would assume, Your Honor. Well, we go back to Arrow 2 and what is required for knowledge. Under this Court's precedent, as well as Arrow 2, knowledge for contributory infringement and intent for induced infringement are not the same thing. The Supreme Court, certainly in Comell and in Global Tech, referred to similarities between them and discussed them together. But Arrow 2 has not been overruled and, in fact, has relied on those decisions. So if you go back to Arrow 2, the knowledge that was imparted to the infringer there was notice of infringement. They were accused of infringement in detail. Yeah, but that can't be enough, right? I mean, just because somebody's accused of infringement doesn't mean that they have knowledge of infringement. It could be a frivolous allegation of infringement. And here they say, well, we had good defenses with respect to the waveform claims to the infringement charge. Why isn't that enough for the jury to find that there was no knowledge of infringement? That effectively equates knowledge and intent for induced infringement, and I think they are different. And if you look at Arrow, it did not require that level of knowledge for contributory infringement, meaning the intent to infringe. There was, if you look at Arrow 2, there was an accusation of infringement, a notice letter that was sent that put them on notice, and that is the starting date for contributory infringement in that case. And there may be some exceptions to a non-frivolous accusation of infringement, but they certainly knew about the patents. They knew that Phillips was asserting them. And even though they may have had a subjective belief of non-infringement, that wasn't present in Arrow 2 and is not, as far as I know, been overruled by the Supreme Court. So for the waveform patents, we think that those allegations of infringement put them on notice and gave them the knowledge under the Supreme Court cases. Even though they had a reasonable defense? Even though they may have had a reasonable subjective belief in non-infringement, because that was not required in Arrow and that has never been the requirement. In fact, if you look at this Court's cases, cases like Hewlett-Packard and DSU, they do draw a distinction between contributory infringement and inducement for those purposes. As Your Honor recognized, I think the self-test patents are different because they did not put on an argument of infringement of most of the self-test claims.  Non-infringement of the self-test claims, that's right. And so there was certainly nothing there for the jury to find that they had any belief of non-infringement. Zoll made a passing reference at the end to substantial non-infringing uses. But I think that the case law we have cited on like I-4I and Lucent, that those features are separable from the overall device and so they don't constitute substantial non-infringing uses. If I could address briefly the main argument in our opening appeal on indefiniteness of Zoll's 526 patent. Here, depending on the conditions for the testing of the electrodes, an electrode may or may not infringe. We've laid out the conditions that are not specified in the patent, their temperature, the number of shocks. Suppose somebody drafted a patent in which the conditions were specified to be at room temperature, say 65 to 85 degrees, whatever. Would that patent be indefinite if it said you infringe, if it exceeds a specified level at any point during that temperature range? I think that would be definite if it said it exceeds that number with any temperature in that range, yes. But that would also... Why isn't this like that? Because there was evidence that someone of skill in the art would have known to use this at room temperature and make the determination of room temperature. It can't be that every condition known to someone skilled in the art has to be written into the patent itself. I would agree. Every condition doesn't have to be written in. But these are important enough that they make a difference. We're talking about a 1 ohm measurement here, and the difference between 0.9 and 1.1 can be a few degrees in temperature. And without more precision than that, someone doesn't really know. They test their electrodes, and they get one result, and then somebody else, the patent owner, tests it. And they could manipulate the conditions, change the temperature, lower the temperature, use ten shocks because the first five don't infringe until it gets to that point. All of those conditions are not specified in the patent, and that's really the problem with it. Someone doesn't know what conditions to use and the fact that the conditions can be manipulated. I'll save the rest of my time if I may, Your Honor. Thank you. I thought you would, Mr. Jackson. Mr. Gindler. May it please the Court, David Gindler for Zola Medical Corporation. I'm here with my colleague, Rich Bernholtz. I'd like to first respond to the appeal by Phillips, and then I'll address our own cross appeal. So with respect to the test patents, you conceded infringement in the district court. And I guess what I'm wondering is how could a reasonable jury fail to find contributory infringement when you basically conceded that there was no defense with respect to infringement? So I disagree with the factual statement that you made, which was that we conceded infringement. So here's what happened. Well, your expert testified they were infringing. So let me just provide some context. I want to answer your question quite directly. We never conceded infringement at any time before the case was filed. We chose not to put on, given the time we had, a non-infringement case on the self-test patent. Your expert testimony that it was infringing is in the concession? He was asked that question on cross. He did not give any opinion at all, in our case, on infringement. That's correct. No, even worse than that. He said it was infringing. He specifically said that. He was asked would the devices infringe, and he said yes. The question's a little odd for the reason you pointed out, I think, earlier, which is that the devices have in them software and other components which are capable of being run by somebody in an infringing manner. What's interesting, though, your Honor, is that even with that testimony, Philips did not win on all of its self-test claims. They lost on some. So on the 374 patent, they lost on claims 66 and 73 against our AED Pro, and they lost on the 374 patent on claims 66 against our E-Series and our M-Series. They did not even prevail. They didn't put on an adequate case of infringement. Even with that one admission by our expert after we focused our case on the issues of invalidity, which we thought were the strongest, they couldn't even prevail on all of the self-test claims. In fact, that's not the only thing they lost. They lost other claims.  Well, suppose we disagree with you. Suppose we say, okay, with respect to the test patents, there was no reasonable infringement defense, and the knowledge required by Comil was present. Do you have any other argument as to why there was no contributory infringement, why the jury could find no contributory infringement? Well, what matters, Your Honor, is putting on evidence of the subjective intent, the knowledge of the accused party. That's what's required under Comil. That's what's required under Global Tech. Infringement does not equal knowledge of infringement. It doesn't equal intent to infringe. It just means they were found to infringe. They contested infringement before the case was filed. There was an exchange of correspondence. There were meetings. They could not come to a meeting of the mind at all. What they didn't do is question, for example, any of our witnesses and say, can you take a look at claim X of this patent and tell me why it is you don't infringe that claim or this claim of that patent? Tell me why you don't infringe that claim of the patent. And what that will do is get you to an answer of – Could I clarify? Yes. I think I understand what you're saying, but I want to make sure. Are you resting your defense of this contributory claim entirely on the knowledge component and that you didn't know you were infringing, but if we – instead of that there were substantial non-infringing uses? So I think we've made several arguments in our papers. So we have argued at length on the knowledge component, knowledge being an intent, being a quintessential jury question. And here Phillips failed to put on a case of what our intent was. They could have done that. They could have tried to do that. They didn't, probably because they knew they wouldn't do a very good job with it, because it was hotly contested beforehand. You're continuing to argue knowledge. I just want to be clear that that's your point and not that you're arguing on the substantial non-infringing uses. Your Honor, there are substantial non-infringing uses on the self-test patents, because just because they have these capabilities, you actually don't have to use the capabilities. You can choose to use them or not. So, for example – But it's a shift with – so that it is infringing, right? In other words, these units have in them software and components, which if operated in a certain way – Wait, wait, wait. Just answer my question. Isn't it true that they're shipped, so they're infringing? No. No? No, they're shipped – when they are shipped, they are shipped with no battery inside, so nothing is operating. So the first thing that has to happen is that – So what would you – are you saying that people wouldn't insert a battery into it? You have to insert a battery, and then you make decisions about what you want to do. I'll give you an example. If you put in the battery, it performs in an infringing manner, correct? Not necessarily. No, the way it's shipped. Unless the user makes a change in the settings, it infringes. Not necessarily, because I'll tell you why. So, some of the self-test claims relate to using either a first periodic schedule or a second periodic schedule. You can choose one, you can choose the other. Is it not shipped with defaults that cover both the first and the second schedule? It's shipped so you can choose, absolutely. No, that's not answering my question. Okay, I'm sorry. I assume that if the user takes it out of the box and puts the batteries in, it's operational, right? It is operational, that's correct. But they don't have to make any further choices. And you have to attach the electrodes as well. They don't have to make any further choices if they don't want to. If they don't want to, they could, I think, just leave it alone. And if that's the case, what are the default standards put in there? Are those infringing? Your Honor, I think the answer varies quite a lot. There are, I think, six accused devices, and I'm not sure I know the answer off the top of my head for all six devices. Four of them are hospital devices. Two of them are meant to be used in public places. I'm not sure the answer is the same for each of those. Well, let's talk about the public places ones, because those seem the ones that are most likely to be shipped to require no additional selections. And what I don't remember, Your Honor, what I don't remember is whether or not when those are shipped, if, for example, they're shipped to automatically work with two different periodic schedules. I just don't know the answer to that question if you plug the battery in. Let's assume they are. Okay. Do you have any argument against contributory infringement for those devices? Except your knowledge stuff. I don't want to talk about that anymore. I'm trying to get at if they're shipped with these defaults that have the two schedules for the self-test, and all you have to do is put a battery in, those, why don't those contributory infringe? Well, there's one other problem that we pointed out in our papers, which is that contributory infringement requires acts, predicate acts, of direct infringement. So, in other words, the end users would be the direct infringers. In this case, Phillips presented literally no evidence of how any end user actually uses the product. They did ask some questions of a couple of Zoll witnesses about do you think that the end users use the product as intended. The answer was yes, we think so. But no evidence was put on. They didn't bring in one hospital, one airport, one anybody. This also provides a basis to affirm the jury's verdict. The question is, is there evidence? They pointed out that they sold the things, and they sold them in a default setting that was infringing under the assumptions we're making. Why isn't that evidence that when it was received by the people that they used them in an infringing manner? Your Honor, it's possible to take the machines, for example, if you're in a hospital, and decide I don't want to run the test automatically. I want to run it on power up. That's a choice you can make. You can make other choices as well, which take it out of infringement. The software has that capability. But they chose not to put on that evidence, and the jury may have asked themselves the question, okay, I've heard the jury instructions, and the jury instructions require, the jury instructions require that there be predicate acts of infringement by a third party. So is there some evidence that some hospitals, some end users actually got the equipment and were using it in just that fashion? It wasn't put on. It's the single strongest evidence that they could have put on. You have a jury verdict that the devices, when used, infringed, right? The jury was also asked. Is that correct? I'm sorry, I didn't understand your question. Pardon me? Could you just repeat your question? You have a finding, a jury verdict, that these things, these devices, when used, infringed self-test patents. Why isn't that itself a finding that there was infringement? Because the devices were shipped to people and sold to people. Why don't you have a jury finding of direct infringement by the users? Because it's a method claim. Every claim here except one is a method claim. Method claims are only done by practicing the method. The only, there's one claim, the self-test, the fail-safe claim, is the only non-method claim. And so you show infringement. The jury found that the method claims were infringed, right, by the devices. It is. That was the finding. It's an odd finding, as Your Honor pointed out, because normally you have a party accused of direct infringement or a party accused of contributory infringement but not a device accused. Your Honors, I would like to take some time to talk about our cross-appeal. Would now be an acceptable time for me to move on? Your Honor, you have a total of four minutes left, so you can use it now or to respond as you wish. Your Honor, we did treat the jury verdict as a finding of direct infringement against all, even though it does talk in an odd way about devices directly infringing. I admit it was unusual. We weren't there at the time. Our firm didn't try the case. But we saw that, and that's how we interpreted it for purposes of the appeal. I want to first talk about the waveform patents. And in the waveform patents, there is a significant claim construction issue, and that is what does the discharging step mean? Is it any delivery of electricity, or does it mean the electro-therapeutic shock? And I think if you look at the language of the claim, it's very hard to reach a conclusion that it's anything other than the electro-therapeutic shock, because that's how the claim is written. The preamble is directed to a delivering electro-therapy to a patient through electrodes connected to an energy source. The discharging step recites discharging the energy source across the electrodes to deliver electrical energy to the patient in a multi-phasic waveform. Multi-phasic is not in all the claims. So the same energy source and electrodes used to deliver electro-therapy as stated in the preamble are used to deliver the electrical energy to the patient in the discharging step. In other words- Before you use all your time, can I redirect you to the- Absolutely. The 460 patent claim and the anticipation by Wiley? Because that's the one I find most troubling in terms of, at least for me to decide, because it seems to turn on whether Wiley shows two different tests on two different timetables. Is that right? Yes. And why isn't the Wiley reference ambiguous enough to support that there's only one test? Well, let me actually direct you to, I think, exactly where you need to read. Let me just pull up the patent, please. I'm at 14.918, which is a flow chart in the Wiley reference. What I wanted to do was actually give you a passage to read. Okay. 14.918. The place where I think it's just very clear is if you start reading in column 6 at line 3- This is on 14.941. Yes. It's the Wiley patent. It's a patent that begins at page 14913 of the appendix. And if you look at page 14931, what you will see, starting at column 6, is a description. It runs through, actually, column 7 and even continues to column 8. And it describes each test, step by step. It starts by talking about the CPU startup test that is run. And then it talks about if, during the one hour of the day that the machine is programmed to run a full battery of tests, it then talks about each and every one of those tests that gets run. So if you read from column 6 at line 3 and you keep going to at least, say, column 8 at line 13, you get- It talks about both- Okay. So this is a big block of quotes. Where in this- I think the number of the issue is, is this CPU test really a test or is it just the machine turns on and off? Is there something specific in that language? Sure. Let me just- It might be helpful if I just read it to you. The auto test routine is initiated when the time on the real time clock equals a previously selected auto test start time stored in EEPROM and the CPU memory. The auto test start time is preferably set to a time when the machine is not likely to be used. Okay. And that's talking about the CPU test? That's not talking about the other daily tests? That's correct. And it says, after power up of the main CPU, the CPU performs its standard power up self test internal to the particular type of CPU in step 210. And then it talks about- I'm now jumping down to same column to line 61. If the CPU self test did not fail step 212, then the main CPU determines that a power switch is on in step 222. And then it goes on. Mr. Kindler, your time is up and I think it doesn't help to do a lot of reading. Is your question- Yeah, no, I have your argument. Your time is up and one of your problems is you cross examined at least six issues. But we'll give you three minutes rebuttal time on the cross appeal and let's hear from- Thank you. Mr. Jakes. And you have almost seven minutes. Thank you. I'll start with the last issue on the cross appeal on Wiley. The experts disagreed on the way that that should be read and whether CPU power up- Well, I get that, but I look at the patent myself and it seems- And maybe this is the problem because maybe I shouldn't, as an English major, be trying to read these patents. But it seems to me that flowchart we're talking about, it uses the word CPU test and then a little later it uses a different test. And the patent specification that he just read to me talks about two different tests. It uses those words. Our expert disagreed that that was a self test. It's, as I think you described it, power up and power down and it does it every hour and checks the clock. And that was not what was meant by a self test. This is an anticipation argument. It's a factual question. Our expert did disagree. They had clear and convincing burden. So I think that's where we are on that. On the question of the waveform patent infringement, I believe they'll really make two arguments. One on claim construction and one on the evidence. Even crediting their argument on claim construction about a therapeutic shock, there's evidence in there that they measured the impedance during the shock. And we don't have to go very far. It's just as far as their own website, which was shown repeatedly at trial, which said during the shock that the impedance measurement took place. They used the word shock. But even so, they're trying to read something more into the claims with therapeutic shock. This sensing pulse or test pulse that they like to call it, it's part of the overall waveform. The prior art had a separate test pulse than a waveform. The judge's construction, he merely construed the discharge step as discharging the energy source. It happens during the discharge of the energy source. It happens during the main part of the waveform. You can't parse it out that way. And if I could go back to a couple of issues on our main appeal, the self-test. Before you move on, because I don't want to let you get away, even though I didn't get to your comment, I also had some questions about the no ambiguity funding on claim 43 of the 374 patent. Right. I mean, that one seemed to me to be much stronger in their favor. The fail-safe digital display. Yeah. Well, again, we do have a factual dispute over whether or not the Vivalink brochure, which is a very cursory reference, whether it does actually disclose a fail-safe display. So what is a fail-safe display? I know that's a factual one, and you say it's very cursory, but it talks about that precise thing in the brochure. It does. And it does talk about— That would be really problematic, even on this very high standard of review. Yes. Well, it comes down to what is fail-safe, as our expert explained it. It's not just a matter of did the battery fail. It's not just a matter of did some component fail. The one thing that the Vivalink brochure doesn't show is that if you run self-tests, and you get an okay or a pass symbol, and the battery fails, what happens? It has to say if it is not working in order for that to be a true self-test. And that's what's disclosed in the patent. That's what is understood by self-test. If a component fails, if the battery fails, it will show not okay. Not if it fails in a particular state, it will stay in that state. And that's all that the Vivalink brochure shows, that if it fails in a state where it shows a failure, it will stay. That doesn't answer the other question. Our expert questioned that, whether or not that's truly a fail-safe display. I don't follow that. Okay. Because if it fails, it's going to show a failure. And if it's not failing, then you don't need to show any kind of that it's failed because it's working. Well, if I could go through those two scenarios just quickly again. You have one where self-tests run, and it shows a failure, and then the power dies. And that's really what's described. It will continue to show failure. What it doesn't describe is the opposite. You run the self-test, and it shows pass, and then the batteries fail. What happens to that? Some of these indicators, they're mechanical. They can be stuck in one position or another. The one that's described in the patent to be truly fail-safe, if there's no power, if anything fails, it will show not okay no matter what. And so that condition is not really satisfied in the Vivalink brochure. Okay. I don't want to take up too much of your time. You can get back to your main argument. I only have a couple of other things on the contributory infringement. The self-test in those old devices, they are pre-programmed to run self-tests on two schedules. We did put on evidence that there were no substantial non-infringing uses. It really does come down to when you're shocking somebody or the self-test, are those portions of the device useful for anything else, and they are not. And whether or not the customers use these devices, we put on circumstantial evidence. We didn't have somebody come in and testify, yes, I've used this device to shock, but there was certainly plenty of evidence that this is how it was. Yeah, but that's the wrong test, unfortunately, for you. It's not a question of whether there was plenty of evidence for the jury to rule in your favor. The question is whether there was an absence of evidence, a lack of substantial evidence to rule against you. Well, as Your Honors recognize, there was a finding that these devices directly infringe. And there's no contrary evidence from Zoll that somehow these devices were not used as they were intended, that they were not used to defibrillate people, that they turned off the self-tests. There's absolutely nothing in there that says even though these were default, people actually turned them off. If that were the case, somebody would have said that, and that's not the situation here. Any further questions? We've got it, Mr. Jase. Thank you very much. Mr. Gidler has three minutes for rebuttal on the cross-appeal. Thank you. Thank you very much. I did want to return briefly to the question of contributory infringement. So, first. This is on the cross-appeal? Well, I just heard Mr. Jase. Well, I'm happy to argue just on the cross-appeal. That's all you're entitled to. That's fine? You don't have the last word on issues that you didn't appeal. Thank you. First, on the issue of infringement of the waveform patents. Phillips has argued that there's just really no difference. We have just sort of this one big pulse, and that's just not true, and Phillips' own expert recognizes exactly what happens. Phillips' expert confirms the following, and I'm just reading his testimony. Zoll's products, in this case, determine impedance during a sensing pulse, use that to pick a schedule, that's how the waveform, the therapeutic electrotherapy is to be delivered, and it is that schedule that is then used to deliver the rectilinear biphasic defibrillation waveform. He also said that the sensing pulse is not sufficient under any scenario to defibrillate a patient. It doesn't have the energy. All that it's meant to do was sense and figure out what the impedance is. And that is why, under the correct construction for the waveform patents, there can be no infringement at all. There's a second reason that Zoll cannot be found to directly infringe the waveform patents, and that is all of them are method claims, and all of them require shocking of patients. Zoll is not in the business of shocking of patients. The only evidence in the record of Zoll shocking anybody is actually evidence of clinical trials, which themselves are protected, all of which took place more than six years before the lawsuit was filed. So even if you could attribute the clinical trials to Zoll, and even if they weren't protected, they were all well more than six years, and that's the only evidence that Zoll, at any time, ever used a defibrillator on a patient. We test them, but not on people. They're defibrillators. On the self-test patent claims, Your Honor, Judge Hughes, if you do look at the passage I read to you, which is starting at column six and going to column eight, it makes it very, very clear exactly what the nature of the two tests is, and in fact, it walks you through that flowchart, which you see, and I understand that looking at a flowchart can sometimes be confusing. I get that, but on the standard review here, we're looking at if there's any evidence that can support the jury's decision, and if their export said the CPU test really isn't a test as intended by the patent, can't the jury rely on that? I'm not sure what he said. What he said is that it just powers up and doesn't perform a test. That's the argument which they made in their brief. It just powers up. It actually says it powers up and then performs a test. That's exactly what it said. Thank you, Your Honors. Thank you, Mr. Gindler. Fortunately, we haven't heard anything here that's shocking. Thank you.